UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JENNIFER MCWILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01419-JPH-TAB |
| | ) | |
| FRANKTON-LAPEL COMMUNITY SCHOOLS, | ) ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Jennifer McWilliams was terminated from her position at Frankton Elementary School because of a comment she made on Facebook regarding *The Leader in Me*, a program used by the School.  Ms. McWilliams sued the school district, Frankton-Lapel Community Schools, alleging that her termination was unlawful because her Facebook comment was protected speech under the First Amendment.  The parties have filed cross motions for summary judgment.  For the reasons that follow, Ms. McWilliams's motion is **DENIED**, dkt. [60], and FLCS's motion is **GRANTED**, dkt. [64].

**I.**
**Facts & Background**

The parties have filed cross-motions for summary judgment, so the Court takes the motions "one at a time."  *American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016).  For each motion, the Court views and recites the evidence and draws all reasonable inferences "in favor of the non-moving party."  *Id.*  That's not necessary here, however, because even when all

1

evidence is interpreted in Ms. McWilliams's favor, FLCS is entitled to summary judgment.

## A. The Parties

Frankton-Lapel Community Schools ("FLCS") is the public school system covering the towns of Frankton and Lapel, Indiana.  Dkt. 61 at 5.  At all relevant times, Robert Fields was the Superintendent of FLCS and Ronda Podzielinski was the principal of Frankton Elementary School.  Dkt. 22-1 at 1 (Fields Aff. ¶¶ 2–3).[1]  Ms. Podzielinski's duties "included overseeing, implementing, and conducting evaluations of teachers and staff" and she had "ultimate responsibility for communications with parents . . . and the development and programming of academic and non-academic instruction." Dkt. 66-1 at 1 (Podzielinski Supp. Aff. ¶ 3).

Jennifer McWilliams worked at Frankton Elementary as a "Title I Interventionist" responsible for working with small groups of students who need help with reading skills.  Dkt. 60-1 at 11, 23–24 (McWilliams Dep. at 10:15–21; 22:2-23:23).  She was also the parent of a child attending the School.  Dkt. 69-1 at 1 (McWilliams Supp. Decl. ¶ 2).

## B. The *Leader in Me* Program at Frankton Elementary

*Leader in Me* (LIM) is a program modeled off *The 7 Habits of Highly Effective People*, a book by Stephen Covey, and has been adapted for

---

[1] Affidavits from both Ms. Podzielinski and Mr. Fields were submitted in opposition to Ms. McWilliams's motion for preliminary injunction, *see* dkts. 22, 24, and have been designated as summary judgment evidence.

schoolchildren into *The Seven Habits of Happy Kids*.  Dkt. 60-6 at 11 (Wildoner Dep. at 10:1–11); dkt. 64-4 at 1.  The primary goal of LIM is to "help increase leadership capacity in adults and students."  Dkt. 60-6 at 10 (Wildoner Dep. at 9:21–22).

Frankton Elementary began implementing LIM during the 2017–18 school year.  Dkt. 60-13 at 12 (Podzielinski Dep. at 11:16–20).  The School created seven "Action Teams" of teachers that focused on bringing LIM resources and information to students, families, and staff, and incorporating the "Seven Habits" into the school environment.  *Id.* at 31–32 (Podzielinski Dep. at 30:8–31:13); dkt. 64-7 (list of action teams).  The cover of Frankton Elementary's 2019-2020 *Parent/Student Handbook* prominently displays "The Leader in Me™ — great happens here," followed by the list of LIM's "Seven Habits of Happy Kids."  Dkt. 64-4 at 1.  The first page of the *Parent/Student Handbook* states: "We are excited to continue The Leader in Me process to help prepare students to succeed in the 21st century. Students will learn critical skills and characteristics such as: Effective interpersonal skills, strong work ethic, sense of teamwork, problem-solving, and goal setting. Please talk with your child about the 7 Habits and we look forward to sharing additional Leader in Me information throughout the school year."  *Id.* at 2.  Ms. Podzielinski also discussed LIM with parents in periodic newsletters.  *See, e.g.*, dkt. 64-12 at 1 ("Dear Parents . . . This year my Principal's Leadership Award will recognize our student leaders in grades K-6 based on the 7 Habits students are learning and applying everyday.").

3

The School annually held four LIM "Lead Days," consisting of small-group sessions where students were given a PowerPoint lesson and did activities based on one or more of the "Seven Habits." Dkt. 22-2 at 4 (Podzielinski Aff. ¶ 14). Designated "Lighthouse Coordinators" planned, organized, and coordinated the Lead Days. Dkt. 60-13 at 33–34 (Podzielinski Dep. at 32:18–33:6). After Lead Days, the "Family Learning Action Team" sent home worksheets about the habits discussed that day for parents and students to fill out together. Dkt. 64-10. Ms. McWilliams was not a Lighthouse Coordinator or on an Action Team, but she led a Lead Day small group while she was employed at the School. Dkt. 22-2 at 4 (Podzielinski Aff. ¶ 14).

Frankton Elementary worked with a LIM "Coach," Courtney Wildoner, who provided in-person training and support to teachers. Dkt. 60-6 at 10 (Wildoner Dep. at 9:12–15). Ms. Wildoner used, and encouraged the School to use, LIM-specific tools like the "Measurable Results Assessment" (MRA), "Action Planning Forms," and "Lighthouse Rubric" to assess how the School was progressing in its own goals for LIM implementation. Dkt. 60-18 (Wildoner email to staff); dkt. 60-6 at 26–33 (Wildoner Dep. at 25:1–32:7). The MRA form explains, "it is very important that the scores in the MRA be used as a guide for continuous school improvement, not as an accountability measure." Dkt. 60-17 at 1.

Using the LIM program, schools can achieve "Lighthouse Certification," a title given by the company that developed LIM to "high-performing *Leader in Me* Schools that serve as exemplars to other[] schools as well as the community by

achieving excellent results in teaching leadership principles, creating a culture

of leadership, and aligning academic systems with larger goals." Dkt. 60-5 at

36. The Lighthouse Action Team at Frankton Elementary, of which Ms.

Podzielinski was a member, "discussed Lighthouse [Certification] on multiple

occasions and each time affirmatively decided that [the School] would not

pursue it." Dkt. 66-1 at 2 (Podzielinski Supp. Aff. ¶ 6).

### C. Evaluation of Teachers at Frankton Elementary

Teacher evaluations are based on a supervisor's observation of the

teacher during a class period. *See, e.g.*, dkt. 60-20. Each evaluation begins

with a section titled "Scripting" where the evaluator documents their

observations and associates their observations with three "Domains" of formal

evaluation criteria. *Id.* at 1–2. The evaluator then rates the teacher from

"Ineffective" to "Highly Effective" in sub-categories of each "Domain." *Id.* at 2–9.

"Domain 1: Purposeful Planning" has five sub-categories, "Domain 2: Effective

Instruction" has nine sub-categories, and "Domain 3: Teacher Leadership" has

two sub-categories. *Id.* at 2–9. Each sub-category has criteria that can be

highlighted to show aspects of effectiveness. *Id.*[2] One criterion says an

"effective" teacher will "contribute ideas and expertise to further the school's

mission and initiatives." *See id.* at 9. At the end of the evaluation, the

---

[2] For example, the evaluator may observe in the "scripting" section that the teacher "thanks the students and tells them that she will start as soon as they are quiet. [R]eminds them that this is their art time and if they are wasting it with talking, and that is causing them to miss part of art class," and associate that observation with criteria "(2.7.E.6)." Dkt. 60-20 at 1, 8. This means the teacher is "Effective" in Domain 2, sub-category 7, criteria 6: "Almost all students are on task and follow instructions of teacher without much prompting." *Id.* at 8.

evaluator leaves "Comments," "Commendations," and/or "Recommendations" for the teacher based on their observation.  *Id.* at 9; dkt. 60-21 at 8–9.

The School's teacher evaluation form does not include LIM as a performance review category or otherwise reference LIM.  *See* dkts. 60-20, 60-21, 60-22; dkt. 22-2 at 4 (Podzielinski Aff. ¶ 15).  Use of LIM and the "Seven Habits" was, however, referenced in three individual teacher evaluations.  Dkt. 60-20 at 2, 9 ("[The teacher] has a big role in the Leader in Me team. She lives and uses the Leader in Me in all she does around the school", "It is great that you volunteer to take on a leadership role with your special area teachers and with our Leader in Me program."); dkt. 60-21 at 9 ("We also talked about Leader in Me and how she's using leaders to run routine things in the classroom."); dkt. 60-22 at 8 ("Great job of working in leader in me words and qualities.").

### D. Ms. McWilliams's Concern About and Knowledge of LIM

While working at Frankton Elementary during the 2019–2020 school year, Ms. McWilliams "developed concerns about social emotional programs in general and the *Leader in Me* program in particular."  Dkt. 36-1 at 2 (McWilliams Aff. ¶ 5).  She researched LIM, including criteria for how a school becomes "Lighthouse Certified," and "compared the program's stated goals and missions" to the school's LIM-themed events, materials, and "Action teams."  *Id.* at 2–5 (McWilliams Aff. ¶¶ 6–13).  Part of her research included reading the entire LIM website.  Dkt. 64-3 at 20 (McWilliams Dep. at 98:9–19).  Ms. McWilliams attests that Ms. Podzielinski and "others in leadership" encouraged

"Lighthouse Action teams" at Frankton Elementary to "help the school rise to the level of Lighthouse School." *Id.* at 3–4 (McWilliams Aff. ¶ 9); *see also* dkt. 64-3 at 29–30 (McWilliams Dep. at 139:18–142:5). From her research and experience, Ms. McWilliams "reached the conclusion that it would be impossible for [the School] to be certified as a Lighthouse School unless" (1) teachers were evaluated on how well they implemented the LIM culture; (2) the company that developed LIM came to the School and "assessed the staff's buy-in . . . and saw evidence of 'whole school transformation'"; and (3) the School shared LIM with other schools. Dkt. 36-1 at 5–6 (McWilliams Aff. ¶¶ 14–15).

### E. Ms. McWilliams's Facebook Comment About LIM

On Monday, February 10, 2020, after school hours and while using personal devices at home, Ms. McWilliams shared a link on her private Facebook page to a blog post that was critical of LIM, including its cost; the "cult-like atmosphere" it created; the relative lack of proven effectiveness; its "corporate vibes" mirroring those used in pyramid schemes; its potential for cultural bias; and its religious roots in Mormonism. Dkt. 1 at 10 (Verified Compl. ¶ 35); dkt. 60-4 at 1–8 ("Let's Talk about The Leader in Me" Article).

In response to the linked blog post, a Facebook user commented:

> So when I read this I thought...oh my goodness this
> sounds so much like some discipleship tools that are
> being marketed to churches. THIS is very concerning to
> me and YES it is just like a pyramid scheme. It also will
> most definitely label some kids as "not good enough" for
> leadership. I cannot believe that this is in the school.
> From what I read in this article, it sounds like
> something else that I am very familiar with that looks
> great on the surface but when you dig into it you find
> how deceptive it actually is as it works on changing the

7

> language to change the classroom culture to get
> everyone into thinking all the same.

Dkt. 60-3 at 2.

In reply, Ms. McWilliams posted the following:

> That is exactly what it is! We are in our third year and
> it literally has taken over EVERYTHING. The Language,
> awards, all bulletin boards, the [*sic*] have a Committee
> dedicated to pushing this garbage into the community
> & children homes, and teachers are even being
> evaluated on how well they implement it. At this point
> I'm not even sure how you could opt your child out
> because it's incorporated into everything we do. We are
> being advised & graded on how well we use the program
> & next we will mentor another school to begin using it.
> Parents have NO CLUE.

*Id.* at 3 (the "Comment").

**F. The School's Response to Ms. McWilliams's Comment**

Both the School's assistant principal and treasurer showed the Comment

to Ms. Podzielinski.  Dkt. 60-13 at 67 (Podzielinski Dep. at 66:6–14).  Mr. Fields

also learned about the Comment after it was posted.  Dkt. 22-1 at 3 (Fields Aff.

¶ 12).  Upon reading the Comment, both Ms. Podzielinski and Mr. Fields were

concerned because they believed that it contained false statements about

Frankton Elementary's use of LIM.  Dkt. 22-2 at 7 (Podzielinski Aff. ¶¶ 21–26);

dkt. 22-1 at 3 (Fields Aff. ¶ 12).

Specifically, it was "readily apparent" to Ms. Podzielinski that the

following statements were false:

- that teachers are being evaluated on how well they
  implement the Leader in Me program;

8

- that Frankton Elementary School and its staff are being graded on how well they use the Leader in Me program;

- that Frankton Elementary School and its staff will mentor another school in using the Leader in Me program;

- that parents are not being informed about the Leader in Me program; and

- that the program had "literally taken over everything" at the school.

Dkt. 22-2 at 7–8 (Podzielinski Aff. ¶¶ 22–25); dkt. 66-1 at 3 (Podzielinski Supp. Aff. ¶ 7).   Mr. Fields identified the following statements as false:

- teachers at Frankton Elementary were being evaluating on how well they implemented the Leader in Me program;

- staff at Frankton Elementary were being graded on how well they used Leader in Me; and

- Frankton Elementary was going to mentor another school in implementing the Leader in Me program.

Dkt. 22-1 at 3 (Fields Aff. ¶¶ 12–13).

Other staff were also concerned about the Comment.  Frankton Elementary's union representative told Ms. Podzielinski that "she and several other teachers . . . were concerned . . . that the post was communicating incorrect information to parents."  Dkt. 66-1 at 3 (Podzielinski Supp. Aff. ¶ 8). Other teachers expressed to Ms. Podzielinski "a lack of trust in Ms. McWilliams due to her false social media post, which in turn made these co-workers feel anger and leeriness toward her."  *Id.*  Staff concerns about "safety and possible disruptions that might erupt" at an upcoming "Family Leadership" night that

would discuss LIM led to the event being postponed.  Dkt. 22-2 at 8 (Podzielinski Aff. ¶ 28).

After reading the Comment, Ms. Podzielinski, Mr. Fields, the assistant principal, Joe Bowman, and Ms. McWilliams's direct supervisor, Kimberly Gray, (collectively "the administrators"), then met to discuss "the post, what it said, what [they] felt was not true, and talk about what [they] might do about it."  Dkt. 60-13 at 67–68 (Podzielinski Dep. at 66:23–67:1).  The administrators then met with the School's attorney to talk "about the situation and the decision was made to terminate" Ms. McWilliams's employment.  *Id.* at 68 (Podzielinski Dep. at 67:3–5).  There was no additional "investigation" into what Ms. McWilliams said in her post.  *Id.* at 69 (Podzielinski Dep. at 68:1–4).

### G. The Termination Meeting

On Friday, February 14, four days after the Facebook Comment, Ms. Gray and Ms. Podzielinski called Ms. McWilliams to a meeting.  Dkt. 60-24 at 1 (McWilliams Decl. ¶ 3).  Ms. Gray told Ms. McWilliams that the School had to "either let you go, or ask you to resign."  *Id.* at 5 (Meeting Transcript at 3:2–4).[3] Ms. Podzielinski said that the Comment had affected teacher morale, that it made her concerned that Ms. McWilliams may not be a "team player," and that it was "spreading information that is untruthful about the school."  *Id.* at 5 (Meeting Transcript at 3:9–17).

---

[3] Ms. McWilliams recorded the termination meeting and designated a transcript of it as part of her summary judgment filings.  Dkt. 60-24 at 1 (McWilliams Decl. ¶ 3).

Ms. McWilliams asked what she had said that was untruthful, to which

Ms. Podzielinski replied:

> Saying that . . . our teachers' evaluations are based on
> . . . how they're implementing Leader in Me; saying that
> our school is being graded because of the efforts we're
> doing with Leader in Me; that we're mentoring another
> school for Leader in Me . . . and those things are not
> true.

*Id.* at 5–6 (Meeting Transcript at 3:23–4:7).

Ms. McWilliams responded that the Comment was based on her

understanding of how LIM worked, that Ms. Podzielinski had made comments

about how someone was going to "come in and see how our school is

implementing it," and that the goal of "the [LIM] program is we'll mentor a

school just like we're being mentored by a school."  *Id.* at 6 (Meeting Transcript

at 4:8–17).  Ms. McWilliams said the Comment was "just explaining the

process."  *Id.*  She further explained that she had done research on LIM,

spoken to others who were "extremely concerned about" LIM, and said LIM is

"subjective stuff that you guys are pushing onto those kids.  That's true."  *Id.* at

12 (Meeting Transcript at 10:12–19).  At the end of the meeting, Ms.

McWilliams was terminated from Frankton Elementary.  *Id.* at 15 (Meeting

Transcript at 13:4–7).

Ms. McWilliams brought this suit alleging that she was unlawfully

terminated in violation of the First Amendment for having engaged in protected

speech.  Dkt. 1.  She filed a motion for preliminary injunction, dkt. 7, which

the Court denied because, as to the likelihood of success on the merits, there

were "key factual disputes" about whether Ms. McWilliams's Comment was protected under the First Amendment.  Dkt. 41 at 11–12.  The parties have filed cross-motions for summary judgment.  Dkts. 60, 64.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

In ruling on cross motions for summary judgment, the Court takes the motions "one at a time," viewing and reciting the evidence and drawing all reasonable inferences "in favor of the non-moving party."  *Williams*, 832 F.3d at 648.

## III.
## Analysis

To establish a First Amendment retaliation claim, a public employee must prove that: (1) her speech was constitutionally protected; (2) she has suffered a deprivation likely to deter speech; and (3) her speech was at least a motivating factor in the employer's action.  *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013).  Only the first element—whether the speech was

constitutionally protected—is disputed here. For a public employee's speech to be protected under the First Amendment, the employee must show that: (1) she made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) her interest in expressing that speech was not outweighed by the state's interests as an employer in "promoting effective and efficient public service." *Id.* (citation omitted).

The first two elements are undisputed, dkt. 24; dkt. 41; dkt. 65 at 51, so the Court accepts them as having been established for the purpose of resolving the parties' motions for summary judgment, leaving only the third factor— referred to as *Pickering* balancing after the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968)—for the Court's evaluation. But before the Court reaches the traditional "*Pickering* factors," *see, e.g.*, *Harnishfeger v. United States*, 943 F.3d 1105, 1115 (7th Cir. 2019), it must address FLCS's threshold arguments that the Comment was untruthful and that FLCS took adequate steps before concluding that the Comment was untruthful and terminating Ms. McWilliams.

### 1. Whether Ms. McWilliams knew the Comment was false or made it in reckless disregard of the truth

FLCS first argues the Comment was not protected speech because it was false. Dkt. 65 at 20. A public employee's speech is not protected under the First Amendment if she "knew it was false or made it in reckless disregard of the truth." *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942 (7th Cir. 2004). FLCS would be entitled to summary judgment for this

reason only if the undisputed facts show that Ms. McWilliams's statements were "deliberate lies or were made with reckless disregard for the truth." *Swetlik*, 738 F.3d at 828.

Here, Ms. McWilliams attests that she believed the Comment was true based on her research into LIM, which included reading its official website and numerous online articles, combined with her experiences and observations at Frankton Elementary. Dkt. 36-1 at 2–6 (McWilliams Aff. ¶¶ 6–17); dkt. 64-3 at 20 (McWilliams Dep. at 98:9–19); dkt. 69-1 at 2–3 (McWilliams Supp. Decl. ¶¶ 4–8). FLCS designates evidence in support of its argument that the Comment contained false information regarding how teachers were evaluated, how the School used LIM, and that the School did not inform parents about LIM. Dkt. 22-2; dkt. 66-1. Whether Ms. McWilliams "recklessly disregarded the truth in making a statement," however, presents "a disputed factual issue." *Swetlik*, 738 F.3d at 827. Resolution of the disputed factual issues will require making credibility determinations and deciding which facts to accept as true while rejecting others. These are functions reserved for a jury, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), so FLCS is not entitled to summary judgment on this basis.

### 2. Whether the administrators reasonably believed the Comment was false

FLCS next argues that it is nonetheless entitled to summary judgment because the administrators reasonably believed that the Comment was false. Dkt. 65 at 19. Under *Pickering*, "an employer may defeat a First Amendment

14

retaliation claim" even where there are factual disputes as to the truth of the speech so long as the supervisors who made the termination decision "reasonably believed, after an adequate investigation, that the employee's [speech] was false." *Swetlik*, 738 F.3d at 828.[4]

In this case, FLCS argues that Ms. McWilliams's termination was lawful because the administrators reasonably believed that her Comment contained false information. Dkt. 65 at 40–42. Ms. McWilliams argues there is evidence showing that her statements were true. Dkt. 61 at 25-34. Moreover, the administrators could not possibly have reached any conclusion about the veracity of the Comment by just reading it and "made no attempt to adequately investigate." Dkt. 61 at 26.

*Swetlik*, however, does not create a procedural rule that a public employer must utilize a specific set of procedures over a certain amount of time before concluding that an employee's statements were false. Instead, what constitutes an "adequate investigation" depends on the facts and circumstances. Hewing closely to the Supreme Court's decision in *Waters v. Churchill*, 511 U.S. 661 (1994) (plurality opinion), *Swetlik* focused on the information that the employer considered and the reasonableness of the employer's conclusions. *Swetlik*, 738 F.3d at 828. In finding the termination

---

[4] The employer's belief about the truth of the comment is not one of the seven enumerated "*Pickering* factors," but the Seventh Circuit has recognized "the truth or falsity" of the speech may, at times, "be the decisive factor in the *Pickering* balance." *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994).

decision justified, the Seventh Circuit adopted the reasonableness test used in *Waters*, 511 U.S. at 677–78.  *See Swetlik*, 738 F.3d at 828.

In *Waters*, the Supreme Court considered whether a public employee's termination violated the First Amendment when the employer investigated what she had said during a private conversation and terminated her because they believed that her speech was not protected.  511 U.S. at 669–70, 677–78.  The Court concluded that there is no First Amendment violation so long as the employer's belief, even if later proven to have been mistaken, is reasonable. *Waters*, 511 U.S. at 680 ("[I]f the belief an employer forms supporting its adverse personnel action is 'reasonable,' an employer has no need to investigate further.").  As to whether the employer's process for determining what the employee said was reasonable, it depends on the facts of the case; there is no mandatory procedure that must be followed.  The Court stated that "there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion."  *Waters*, 511 U.S. at 671, 678.  "In those situations, many different courses of action will necessarily be reasonable."  *Id.*  The Supreme Court concluded that "[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable."  *Id.*; *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994) ("[D]efendants must prevail if . . . their conclusion was the product of the care that a reasonable manager would use before making an employment decision.").

16

In evaluating the reasonableness of FLCS's actions, therefore, the Court focuses on whether the FLCS decisionmakers reasonably believed that Ms. McWilliams's Comment contained false information and whether their belief was supported by a sufficient factual basis.  Here, the record shows that the administrators were aware of facts sufficient to support their conclusion that the Comment was not truthful.  Specifically, the designated evidence shows that Ms. Podzielinski believed that the Comment contained false statements, including:

- "Teachers are even being evaluated on how well they implement [LIM]."

- "We are being advised & graded on how well we use the program."

- "Next we will mentor another school to begin using LIM."

- "Parents have NO CLUE."

Dkt. 22-2 at 7–8 (Podzielinski Aff. ¶¶ 22–25); dkt. 66-1 at 3 (Podzielinski Supp. Aff. ¶ 7); dkt. 60-3 at 2 (cleaned up).

The designated evidence further shows that as principal of Frankton Elementary School, Ms. Podzielinski had "ultimate responsibility for evaluating its teachers" and knew "[o]ur evaluations of teachers have never included any evaluation of how teachers are implementing The Leader in Me."  Dkt. 22-2 at 4–5 (Podzielinski Aff. ¶ 15–16).  She also knew that:

- neither staff nor the school were "being graded, reviewed, or evaluated regarding their use (or non-use) of The Leader in Me program . . . whether by [the company that developed LIM], the State of Indiana, or

17

any other individual or entity." *Id.* at 5 (Podzielinski Aff. ¶ 17).

- "Frankton Elementary School has not been asked, nor does it have any intent, to mentor another school on how to begin using The Leader in Me." *Id.* at 5 (Podzielinski Aff. ¶ 18).

- the school's parent/student handbook, periodic newsletters, and LIM worksheets sent home with students kept parents informed about how the school was implementing LIM. *Id.* at 5–6 (Podzielinski Aff. ¶ 19).

Based on the knowledge that she acquired as principal, Ms. Podzielinski reasonably concluded that "the falseness of those statement was readily apparent to me when I first viewed that Facebook post shortly after it was posted." Dkt. 66-1 at 3 (Podzielinski Supp. Aff. ¶ 7).

Ms. McWilliams argues that this belief was unreasonable, with respect to the "teacher evaluation" issue, for example, because there are four references to LIM on evaluation forms, dkts. 60-20; dkt. 60-21; dkt. 60-22, and the evaluation forms include a criterion that says an "effective" teacher will "contribute ideas and expertise to further the school's mission and initiatives." *See* dkt. 60-20 at 9.[5]  She argues this criterion is necessarily tied to LIM because Frankton Elementary's mission statement is: "Empowering students to be leaders, encouraging leaders to greatness, inspiring greatness to change the

---

[5] While the Court considers Ms. McWilliams's Comment as a whole for determining whether it was protected speech, the specific consideration of the "teacher evaluation" issue here is offered to show that there is no genuine dispute that the administrators reasonably believed the Comment contained false information, even if a jury could find that some of the Comment was true or mere hyperbole.

world," dkt. 60-13 at 26 (Podzielinski Dep. 25:21-23), which, she argues, came about as a result of the Leader in Me initiative." Dkt. 61 at 27 (citing dkt. 60-13 at 24 (Podzielinski Dep. at 23:14–22)).[6]

But this evidence does not make Ms. Podzielinski's conclusion unreasonable. First, it is not unreasonable for the person responsible for evaluating teachers to know whether a statement about how teachers are evaluated is accurate. Here, the designated evidence establishes not just what Ms. Podzielinski knew, but how she knew it, that is, the basis of her personal knowledge. Dkt. 22-2 at 4–5 (Podzielinski Aff. ¶ 15–19). Moreover, the references to LIM that Ms. McWilliams identified on teacher evaluations are found on four of the 377 pages of teacher evaluations designated as evidence. Dkt. 65 at 22; dkt. 71 at 5. Even if Ms. Podzielinski had read the evaluations before reaching her conclusion, it does not stand to reason that having done so would have changed her conclusion. FLCS's designated evidence shows that a teacher's success or failure with implementing LIM principles is not considered as part of the teacher evaluation process and Ms. McWilliams has not designated evidence from which a jury could find otherwise. And the same goes for the "mission and initiatives" criterion. Even if, as Ms. McWilliams's argues, "it would be completely reasonable for teachers . . . to factor in their contributions to [LIM]" when they complete self-evaluations, dkt. 61 at 26, the

_____

[6] Ms. Podzielinski actually testified that the mission statement was changed because the old one was "very wordy and no one ever could say what it meant," dkt. 60-13 at 24 (Podzielinski Dep. at 23:14-22), not "as a result of the LIM initiative."

perspective of other teachers, or Ms. McWilliams herself, does not factor into the *Swetlik* analysis.

That is, when evaluating whether Ms. Podzielinski and the other administrators reasonably believed that the Comment was false, Ms. McWilliams's subjective beliefs about the veracity of her Comment don't matter. *See Swetlik*, 738 F.3d at 828 (noting that, even if defendants are "not entitled to summary judgment on the theory that a reasonable jury would be required to find [the speech was a] deliberate lie[] or . . . made with reckless disregard for the truth," the court still "*must determine*" whether the employers' beliefs were genuine and reasonable) (emphasis added)).

Ms. McWilliams further contends that FLCS's process, regardless of whether the conclusion was reasonable, was *per se* deficient under *Swetlik* because there was no formal investigation, and she was not interviewed before she was fired. Dkt. 61 at 23–24. But as explained above, what constitutes a reasonable course of action depends on the circumstances, and more than one course of action may be reasonable in a given situation. *Waters*, 511 U.S. at 677–78. *Swetlik* involved dozens of complaints against the police chief and the plaintiff's allegedly protected speech was based on a private phone conversation. Under those facts, a lengthy investigation and interviews of the plaintiff was reasonable to determine what was said during the conversation and whether he had lied when he accused the police chief of directing him to lie other agencies. 738 F.3d at 821–24; *see also Waters*, 511 U.S. at 664–65 (where the speech at issue was a private conversation, which the

decisionmakers were not privy to, so the decisionmakers needed to interview other employees to learn what was said).

Here, the administrators immediately knew the full content of Ms. McWilliams's speech when they read the Comment.  Unlike in *Swetlik* and *Waters*, there was no dispute about what was said, and therefore no need to interview witnesses and make factual findings about what Ms. McWilliams said.  Instead, the issue is whether the administrators could have reasonably believed that Ms. McWilliams's Comment about how Frankton Elementary used LIM was untruthful.  As the person in charge of "overseeing, implementing, and conducting evaluations of teachers," dkt. 66-1 at 1 (Podzielinski Supp. Aff. ¶ 3), and responsible for "for communications with parents," *id.*, it was reasonable for Ms. Podzielinski to quickly conclude that the Comment was not truthful.  Based on her duties and responsibilities, she knew that "evaluations of teacher have never included any evaluation of how teachers are implementing The Leader in Me," dkt. 22-2 at 4 (Podzielinski Aff. ¶ 15), and that the School communicated with parents about the program, *id.* at 5–6 (Podzielinski Aff. ¶ 19); *see supra* at 2–6.

Still, Ms. Podzielinski met with Ms. McWilliams's direct supervisor, the school's vice principal, and Mr. Fields as a next step.  They discussed "the post, what it said, what [they] felt was not true, and talk[ed] about what [they] might do about it."  Dkt. 60-13 at 67–68 (Podzielinski Dep. at 66:23–67:1).  Then they met with the school's attorney to talk "about the situation and the decision was made to terminate" Ms. McWilliams's employment.  *Id.* at 68 (Podzielinski Dep.

at 67:3–5).  Ms. McWilliams has not designated evidence from which a jury could conclude that the administrators' belief was unreasonable or that the procedure they used was "outside the range of what a reasonable manager would use."  *Waters*, 511 U.S. at 678.

\* \* \*

Under *Pickering* balancing, the court ordinarily determines whether "the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service."  *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013) (quotation omitted).  The "proper balance of these competing interests is a question of law."  *Id.* at 1119.  And in cases where the speech "substantially involves matters of public concern," the public employer must make a stronger showing of the degree of disruption or potential disruption.  *Id.*

Here, the general topics of Ms. McWilliams's Comment—the curriculum in public schools and how teachers are evaluated—are matters of substantial public concern.  *See, e.g.*, dkt. 60-4 ("Let's Talk about the Leader in Me" Article); dkt. 60-5 at 1–16 (online articles and comment threads about LIM); *see also* dkt. 61 at 17–18. And the point of her critique—that public schools should not be in the business of using social emotional learning programs like LIM—is a topic of rigorous public debate.  *Id.*  But "the truth or falsity" of the speech may, at times, "be the decisive factor in the *Pickering* balance."  *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994).  Here,

the undisputed evidence establishes that FLCS administrators reasonably believed that Ms. McWilliams's Comment contained false information.  Dkt. 22-2 at 8 (Podzielinski Aff. ¶ 28); dkt. 66-1 at 3 (Podzielinski Supp. Aff. ¶ 8).  Because of this "decisive factor,"  Ms. McWilliams's First Amendment claim must fail.  *Waters*, 511 U.S. at 678; *Swetlik*, 738 F.3d at 829.

**IV.**
**Conclusion**

Therefore, FLCS's motion for summary judgment is **GRANTED**, dkt. [64], and Ms. McWilliams's motion for summary judgment is **DENIED**, dkt. [60].  Because the Court resolves the motions on the written filings, Plaintiff's motion for oral argument is **denied**.  Dkt. 61-1.

Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 12/12/2022

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

James Bopp, Jr.
The Bopp Law Firm
jboppjr@aol.com

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
bborg@cchalaw.com

Courtney Turner Milbank
THE BOPP LAW FIRM PC
cmilbank@bopplaw.com

23

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Melena Sue Siebert
THE BOPP LAW FIRM, PC
msiebert@bopplaw.com